The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STEVEN APILADO, LARON CHARLES,
AND JON RUSS,

                                  Plaintiffs,

      v.

THE NORTH AMERICAN GAY
AMATEUR ATHLETIC ALLIANCE,

                                Defendant.

No.   C10-00682 JCC

**PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**NOTED FOR APRIL 8, 2011**

**ORAL ARGUMENT REQUESTED**

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND RELIEF REQUESTED ................................................ 1

II.  STATEMENT OF FACTS ................................................................. 1

    A.  NAGAAA's Discrimination Against Plaintiffs At The 2008 Gay Softball World Series In Seattle ................................................. 1

    B.  NAGAAA's Purpose and Composition ................................................. 3

    C.  NAGAAA's Facially Discriminatory Rules ........................................... 4

    D.  Organizing And Hosting Of The 2008 GSWS By NAGAAA And Others ................................................................................ 5

III.  STATEMENT OF ISSUES ................................................................ 8

IV.  EVIDENCE RELIED UPON ................................................................ 8

V.  AUTHORITY AND ARGUMENT ........................................................... 8

    A.  The Court Can Determine Whether NAGAAA Is A Public Accommodation On A Motion For Summary Judgment ....................... 8

    B.  NAGAAA Is A Public Accommodation Subject To The WLAD ........... 9

    C.  NAGAAA Is Not A "Distinctly Private" Organization Exempted from the WLAD ........................................................................... 13

    D.  NAGAAA Unlawfully Discriminated Against Plaintiffs Based On Their Sexual Orientation, And Aided And Abetted Others In Doing So ........................................................................................... 17

        1.  NAGAAA's Rule 7.05 violates RCW 49.60 because it facially mandates discrimination based on sexual orientation ..... 17

        2.  NAGAAA discriminated against Plaintiffs based on their sexual orientation in violation of WLAD. ................................... 19

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

       3.     NAGAAA also violated the WLAD because its policies caused other players and teams to discriminate against Plaintiffs ...................................................................................... 21

VI.      CONCLUSION ................................................................................. 21

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1

# TABLE OF AUTHORITIES

2

**Page**

**FEDERAL CASES**

3

4
*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ............................................9, 11

5
*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...................................................9

6
*Community House, Inc. v. City of Boise,*
   490 F.3d 1041 (9th Cir. 2007)...................................................................................18, 19
7

*Duvall v. County of Kitsap,*
   260 F.3d 1124 (9th Cir. 2001) ..................................................................................18, 19
8

9
*E.E.O.C. v. Kamehameha Schools/Bishop Estate,*
   990 F.2d 458 (9th Cir. 1993)...........................................................................................14

10
*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson*
   *Controls, Inc.,*
11
   499 U.S. 187 (1991) ..................................................................................................18, 19

12
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
   475 U.S. 574, 106 S.Ct. 1348 (1986) ..............................................................................9

13
*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973) .......................................................................................................18

14
*Reidt v. County of Trempealeau,*
   975 F.2d 1336 (7th Cir.1992) ........................................................................................18

15
*S. L.-M., ex rel. Liedtke v. Dieringer School Dist. No. 343,*
   614 F.Supp.2d 1152 (W.D.Wash. 2008) .................................................................18, 19
16

**WASHINGTON STATE CASES**

17

18
*Allison v. Hous. Auth. of City of Seattle,*
   118 Wash.2d 79, 821 P.2d 34 (1991) .............................................................................10

19
*Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of the Fraternal*
   *Order of Eagles,*
20
   148 Wash. 2d 224, 59 P.3d 655 (2002) ...........................................................................9

21
*Russell v. Department of Human Rights,*
   70 Wn.App. 408, 854 P.2d 1087 (1993),........................................................................11

22
**WASHINGTON STATE STATUTES**

23
RCW § 49.60 ..............................................................................................................................1

RCW § 49.60.010 .........................................................................................................9, 10, 20

24
RCW § 49.60.020 .....................................................................................................................11

25
RCW § 49.60.030 .....................................................................................................................10

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RCW § 49.60.030(1) ........................................................................................... 19

RCW § 49.60.030(1)(a) ..................................................................................... 20

RCW § 49.60.030(1)(b) ..................................................................................... 20

RCW § 49.60.040(14) ........................................................................................ 20

RCW § 49.60.040(2) ................................................................................... passim

RCW § 49.60.040(26) ........................................................................................ 10

RCW § 49.60.215 ............................................................................................... 20

RCW § 49.60.220 ............................................................................................... 21

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - iv

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# I.   INTRODUCTION AND RELIEF REQUESTED

Based on undisputed facts discovered in this matter, Plaintiffs seek a ruling that the North American Gay Amateur Athletic Alliance ("NAGAAA") constitutes a "public accommodation" under Washington's Law Against Discrimination, WASH. REV.CODE. § 49.60 *et seq.* ("WLAD"), and that NAGAAA unlawfully discriminated against Plaintiffs based on their actual or perceived sexual orientation.[1]

# II.   STATEMENT OF FACTS

## A.   NAGAAA's Discrimination Against Plaintiffs At The 2008 Gay Softball World Series In Seattle

Plaintiffs Steven Apilado, LaRon Charles, and Jon Russ have been playing softball together in the San Francisco Gay Softball League ("SFGSL") for years.  The SFGSL is a member league of Defendant North American Gay Amateur Athletic Alliance ("NAGAAA"), which hosts an annual Gay Softball World Series ("GSWS").  In 2008, the GSWS was held in Seattle (the "Seattle World Series").  PSF ¶ 1.

In August 2008, Plaintiffs and their team, D2, traveled to Seattle to play in the GSWS.  D2 played in Division A of the tournament, the highest-rated and most competitive division.  Plaintiffs' team had played in the GSWS many times before the Seattle World Series, but they had never done better than fourth place.  At the Seattle World Series, however, D2 won its early games and advanced to the championship game.  PSF ¶ 1.

At the start of the championship game, D2 was informed that another team had challenged D2's eligibility to play based on NAGAAA Rule 7.05, which provides that each GSWS team may have no more than two "heterosexual" players on the roster.  The

---

[1] NAGAAA also discriminated against Plaintiffs based on race, but those claims are not at issue in this Motion.  Plaintiffs will prove these claims at trial.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  protesting team claimed that five players, including Plaintiffs, were "heterosexual" under
2  NAGAAA's definition of that term, and therefore that D2 exceeded the two
3  "heterosexual" cap.  PSF ¶ 2.  Although D2, including Plaintiffs, had played in several
4  prior GSWS tournaments, it had never previously been protested based on Rule 7.05.  PSF
5  ¶ 2.

6      The championship game continued, but was interrupted several times for
7  discussions of the protest.  D2 ultimately lost the championship game.  PSF ¶ 3.

8      Immediately following the game, NAGAAA convened a protest hearing at which
9  NAGAAA's Protest Committee, comprised of five delegates from NAGAAA member
10 leagues, questioned each Plaintiff about his sexual orientation.  The Protest Committee
11 Chair was selected and compensated by NAGAAA. PSF ¶ 4.

12     The protest hearing was held in a small conference room inside a complex at the
13 park.  More than twenty people were crowded into the hearing room. PSF ¶ 5.  Most of
14 the people in the room were strangers to Plaintiffs, and Plaintiffs were not told why people
15 other than the Protest Committee members were there.  PSF ¶ 5.

16     The Plaintiffs were called before the Protest Committee one by one and asked
17 questions about their sexual orientation and their sexual interests in men and women.  PSF
18 ¶ 6.  One Plaintiff expressly stated that he was bisexual.  A second Plaintiff expressed
19 attraction to members of both sexes.  A third declined to answer questions about his
20 attractions and interests.  PSF ¶ 7.  NAGAAA's Protest Committee then voted on whether
21 each Plaintiff was "gay" or "heterosexual."  NAGAAA's Protest Committee voted that
22 each Plaintiff was believed to be "heterosexual" under NAGAAA's written definitions.
23 Based on their perceived "heterosexual" sexual orientation, the Plaintiffs were deemed
24 ineligible to play.  NAGAAA's Protest Committee disqualified D2 and Plaintiffs from the
25 Seattle World Series for violating Rule 7.05.  NAGAAA expunged D2's participation in

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  the GSWS from its records and awarded the second place trophy to another team instead

2  of to Plaintiffs' team. PSF ¶ 8.

3       Plaintiffs appealed the results of the Protest Hearing under NAGAAA's Rules.

4  NAGAAA's Commissioner, Roy Melani, knew that the Plaintiffs complained of unlawful

5  discrimination, but nevertheless, upheld the results of the Protest Hearing and denied their

6  appeals of discriminatory treatment based on their sexual orientation.  At NAGAAA's

7  Winter 2009 meeting, NAGAAA's Council and/or its members considered whether to

8  take further action against Plaintiffs and others based on the results of the Protest Hearing.

9  PSF ¶ 9.  NAGAAA admits that Plaintiffs were penalized because of their perceived

10 sexual orientation, and that "[o]nce it was determined that they were heterosexual, there

11 was a consequence that took place, which was their team was disqualified."  PSF ¶ 10.

12     **B.  NAGAAA's Purpose and Composition.**

13       NAGAAA is and was in 2008 a 501(c)(3) non-profit public charity.  NAGAAA's

14 Articles of Incorporation state that its purpose is to promote "amateur sports competition,

15 particularly softball, for all persons regardless of age, sexual orientation or preference,

16 with special emphasis on the participation of members of the Gay community."

17 NAGAAA's main function is to organize the Gay Softball World Series.  NAGAAA

18 describes the GSWS as the largest annual amateur Lesbian, Gay, Bisexual and

19 Transgender ("LGBT") athletic event in the country.  PSF ¶¶ 11, 12.

20       NAGAAA is comprised of regional associations, or "member leagues," from the

21 United States and Canada.  Similar to Little League, NAGAAA affiliates with local

22 leagues, like the San Francisco Gay Softball League, and the local leagues become

23 NAGAAA members for purposes of competing in the GSWS.  PSF ¶ 13.

24       A prospective NAGAAA member league must have operated for two consecutive

25 years with at least 4 teams registered in each of those years (a requirement that can be

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 3

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

waived). The league must also have participated, through a representative, in the preceding NAGAAA Summer Meeting in order to be eligible to petition for membership at the next Winter Meeting. PSF ¶ 13.

NAGAAA's website actively sought to recruit teams and individuals. Any player who played in a sufficient number of regular season games in his or her home league is eligible to advance to the GSWS, provided that the necessary fees are paid. PSF ¶ 14.

In 2008, NAGAAA solicited hundreds of teams and thousands of individual players to play in the 2008 GSWS. NAGAAA charged a $550 tournament admission fee for teams that played in the GSWS, which generated more than $68,000 in gross revenue to NAGAAA in 2008. PSF ¶ 15.

In 2008, NAGAAA did not require its member leagues to be identified as "LGBT softball leagues. NAGAAA also did not require its member leagues to impose any sexual orientation-based restrictions on eligibility to play in regular season games. And NAGAAA did not restrict who the leagues could designate as official representatives on NAGAAA's governing Council, who could be elected to NAGAAA's Board of Directors, or who could be elected to NAGAAA's Hall of Fame. PSF ¶ 16.

At least through 2008, NAGAAA never received a complaint that the participation of heterosexual players had interfered with players' abilities to express their sexual orientation, or with any of NAGAAA's purposes or missions. PSF ¶ 18.

### C. NAGAAA's Facially Discriminatory Rules

In 2008, NAGAAA's Instruments of Governance included a Softball Code that provided rules for how the GSWS would be conducted.[2] The Softball Code applies only

---

[2] "The Open Division's Gay Softball World Series shall be organized and conducted in accordance with the rules and regulations outlined in this Code." The Softball Code, including the two "heterosexual" player cap, applies only to the GSWS and not to regular season play in member leagues. The Softball Code sets forth playing rules for the GSWS; it does not set forth membership criteria for leagues that are affiliated with NAGAAA.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

to the GSWS; NAGAAA member leagues are not required to abide by any of the rules in the Softball Code during their local seasons. PSF ¶ 17.

For the 2008 GSWS, NAGAAA's Rule 7.05 stated:

> Heterosexual players – a maximum of two heterosexual players are permitted on a GSWS roster.
> A team in violation of the heterosexual player guidelines shall be subject to disciplinary action that may include but is not limited to:
> 1) permanent suspension of the heterosexual player from future GSWS and open division events.
> 2) disqualification and forfeiture of all the offending team's games.
> 3) one year's suspension of the team's manager.
> 4) a minimum $100.00 fine imposed against the team's association.

Rule 1.13 stated: "Gay – means having a predominant sexual interest in a member or members of the same sex and includes both gay men and lesbians." Rule 1.16 stated: "Heterosexual – means having a predominant sexual interest in a member or members of the opposite sex." PSF ¶ 19.

Section 8 of the Softball Code authorizes NAGAAA to impose sanctions and penalties, including fines, for players and teams that violate Rule 7.05 during the GSWS. Under Section 8, any team or League Commissioner may challenge a player's perceived sexual orientation and claim that the person is "heterosexual" by filing a protest and paying a fee in accordance with NAGAAA's procedures. Under the NAGAAA rules in effect at the Seattle World Series, after a team or League Commissioner filed a protest under Rule 7.05, NAGAAA was required to convene and hold a protest hearing at which members of a NAGAAA Protest Committee would vote on whether they believed the player to be "gay" or "heterosexual" according to NAGAAA's definitions. PSF ¶¶ 20, 21.

**D.  Organizing And Hosting Of The 2008 GSWS By NAGAAA And Others**

NAGAAA charged an admission fee for those teams seeking to play in the 2008 GSWS.  PSF ¶ 15. NAGAAA entered into contracts with two additional organizers,

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

ASANA and NWQuest, to jointly produce the 2008 GSWS, which was held in Seattle and surrounding cities.[3]  PSF ¶ 22.  The Seattle Sports Commission and the Seattle Convention and Visitor's Bureau supported the GSWS, and the City of Federal Way provided a $10,000 grant to help fund the 2008 GSWS.  The City of Federal Way requested and received a report regarding the tourism impact of the 2008 GSWS, and NAGAAA estimated that it generated several million dollars in revenue for the Seattle region.  PSF ¶ 23.

The 2008 GSWS took place in public parks, fields and other facilities around the Seattle area.  NAGAAA and the other organizers of the 2008 GSWS rented and/or paid for permits to use various public facilities for the 2008 GSWS, including, without limit, the Mural Amphitheatre at the Seattle Center and public softball facilities in the Cities of Kent, Federal Way and Auburn.  PSF ¶ 22.  NAGAAA also entered into contracts with hotels to house participants during the 2008 GSWS and received rebates from hotel(s) based on the number of players who stayed there. PSF ¶ 29.

NAGAAA invited and encouraged members of the general public to observe, for entertainment purposes, the Seattle World Series games and Closing Ceremonies at the public softball facilities it rented.  NAGAAA also encouraged the public to attend other events associated with the Seattle World Series, such as Opening Ceremonies at the Seattle Center (for which it obtained a permit), and NAGAAA's Talent Show, for which admission was charged, which was held at the Hilton Seattle Airport and Conference Center.  PSF ¶ 24.  NAGAAA also supported and undertook benevolent social causes and

---

[3] ASANA is a national organization whose mission is to promote women's softball with an emphasis on the LGBT community.  NWQuest was the Seattle host committee for the 2008 GSWS.  Neither ASANA nor NWQuest had any restrictions on player eligibility based on sexual orientation.  PSF ¶ 22.

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 6

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

projects and asked the public to participate in these service projects (such as the Talent Show).  NAGAAA sought media coverage of the 2008 GSWS and sought to have the 2008 GSWS advertised in local newspapers.  PSF ¶ 26.

Food and beverages were sold for consumption at the 2008 GSWS facilities. NAGAAA contracted with beer and food concessionaires to sell food, alcohol and other beverages at the public softball facilities it rented and to have a beer garden.  NAGAAA received revenue from the sales of food and beverages. PSF ¶ 31.

NAGAAA arranged for goods, merchandise, and services to be sold at the 2008 GSWS.  PSF ¶ 32.  NAGAAA contracted with a merchandise vendor, and licensed its trademarks to vendors, to sell merchandise for the GSWS, from which NAGAAA profited.  NAGAAA charged a fee to other vendors to allow them to sell merchandise, goods and services at the public softball facilities it rented.  PSF ¶ 32.

NAGAAA allowed businesses and other entities to advertise before, during and after the GSWS.  NAGAAA included advertisements in the Players' Program and allowed commercial entities and other organizations to include their goods, or information about their goods or services, in players' welcome bags.  NAGAAA also included advertisements on NAGAAA's website, and at the site(s) of the GSWS, such as on banners.  PSF ¶ 33.

NAGAAA also solicited and accepted national, regional and local sponsors to help fund the 2008 GSWS.  NAGAAA maintained a website which, among other things, sought to actively recruit sponsors.  NAGAAA had a business development director who sought to gain national and other sponsorships for the GSWS and also used a professional marketing company for the same purpose.  NAGAAA sponsors for the 2008 GSWS included Subaru, Coors, American Airlines, Avis and others.  NAGAAA allowed at least some of those sponsors, such as Subaru and Coors, to have products and/or display

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   banners with their logos at the public softball facilities where the 2008 GSWS was held.

2   NAGAAA allowed third parties, such as NWQuest, to control websites relating the 2008

3   GSWS.  NAGAAA required teams to be members of the American Softball Association

4   and facilitated membership at the GSWS for those teams who were not members.  It also

5   allowed third party organizations, such as GLAAD (the Gay and Lesbian Alliance Against

6   Defamation), to distribute membership information in the players' welcome bags; and

7   provided rewards or awards, such as trophies and other memorabilia to individuals. PSF ¶

8   ¶ 31, 33, 34.

9                    **III. STATEMENT OF ISSUES**

10          1) Is NAGAAA a public accommodation subject to the WLAD?

11          2) Did NAGAAA violate Plaintiffs' right to be free from discrimination based on

12   sexual orientation under the WLAD?

13                    **IV. EVIDENCE RELIED UPON**

14          Plaintiffs rely on the evidence stated in their Statement of Facts ("PSF"), Exhibit A

15   hereto, including relevant portions of the deposition testimony (and exhibits) of

16   NAGAAA's Fed. R. Civ. P. 30(b)(6) deponents (Roy Melani and Gary Carter), Roy

17   Melani, Chris Balton, Randolph Dobbs, and Johnny Russell, all attached to the

18   Declaration of Suzanne J. Thomas.  Plaintiffs also rely on the declarations of LaRon

19   Charles, Jon Russ , Steven Apilado and Roy Melani, all attached to the Declaration of

20   Suzanne J. Thomas.

21                    **V.  AUTHORITY AND ARGUMENT**

22          **A.  The Court Can Determine Whether NAGAAA Is A Public
              Accommodation On A Motion For Summary Judgment**

23

24          Summary judgment is appropriate if, after viewing the evidence in the light most

25   favorable to the nonmoving party, the Court determines there are no genuine issues of

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 8

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  material fact.  Fed. R. Civ. P. 56(c)(2).  There is no genuine issue of fact for trial where

2  the record, taken as a whole, could not lead a rational trier of fact to find for the

3  nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

4  586 (1986).  The Court must inquire into "whether the evidence presents a sufficient

5  disagreement to require submission to a jury or whether it is so one-sided that one party

6  must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

7  (1986).  The moving party bears the initial burden of showing that there is no evidence

8  that supports an element essential to the nonmovant's claim.  *Celotex Corp. v. Catrett*, 477

9  U.S. 317, 322 (1986).  Once the movant has met this burden, the nonmoving party must

10  then show that there is in fact a genuine issue for trial.  *Anderson*, 477 U.S. at 250.  If the

11  nonmoving party fails to establish the existence of a genuine issue of material fact, "the

12  moving party is entitled to judgment as a matter of law."  *Celotex*, 477 U.S. at 323-24.

13  Courts can properly decide whether an organization constitutes a public

14  accommodation subject to RCW 49.60.010 *et seq.* on summary judgment.  *See Fraternal*

15  *Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of the Fraternal Order of Eagles*,

16  148 Wn.2d 224, 59 P.3d 655, 672 (2002) (finding no material question of fact precluding

17  plaintiffs' motion for summary judgment regarding the fraternal organization's status as a

18  public accommodation.)  Where an organization claims that it is not subject to the WLAD

19  because it is "distinctly private," the burden falls on the organization to show that it falls

20  within that narrowly construed exception.  *Id.* at 256-257 (upholding summary judgment

21  for plaintiffs because defendant organization had not met its burden of showing that it fell

22  within the "distinctly private" exception to the WLAD).

23  **B.  NAGAAA Is A Public Accommodation Subject To The WLAD**

24  When it enacted the WLAD, the Washington legislature made clear that

25  "discrimination against any of its inhabitants . . . is a matter of state concern" that

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 9

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  "threatens not only the rights and proper privileges of its inhabitants but menaces the

2  institutions and foundation of a free democratic state."  RCW § 49.60.010.  "The right to

3  be free from discrimination because of race, . . . , color, national origin . . . **sexual**

4  **orientation** is recognized as and declared to be a civil right."  RCW § 49.60.030.[4]  Given

5  the importance of the rights at stake, the legislature explicitly mandated that the law be

6  "construed liberally" in order to effectuate its nondiscrimination goals.  RCW

7  § 49.60.020.[5]

8         When it defined "public accommodation" in particular, the legislature cast an

9  extremely wide net in order to protect its citizens to the maximum extent possible.[6]  In

10  relevant part to this case, the WLAD defines "any place of public resort, accommodation,

11  assemblage or amusement" as including but not limited to:

12         any place . . . kept for gain, hire, or reward . . . or where charges are made for
        admission, service, occupancy, or use of any property or facilities, whether
13         conducted for the entertainment, housing, or lodging of transient guests, or for the
        benefit, use, or accommodation of those seeking . . . recreation . . . or for the sale
14         of goods, merchandise, [or] services . . . [or] where food or beverages of any kind
        are sold for consumption on the premises, or where public amusement,
15

---

16  [4] "Sexual orientation" means heterosexuality, homosexuality, bisexuality, and gender
   expression or identity. ….  RCW § 49.60.040(26).

17

18  [5] The legislature's enactment of the WLAD was an "exercise of the police power of the
   state for the protection of the public welfare, health, and peace of the people of this state,
19  and in fulfillment of the provisions of the Constitution of this state concerning civil
   rights."  RCW § 49.60.010.  Practices of discrimination based on, *inter alia*, sexual
20  orientation or race are "matters of state concern."  *Id.*  The purpose of the WLAD is a
   policy of the highest order.  *Allison v. Hous. Auth. of Seattle*, 118 Wn.2d 79, 86, 821 P.2d
21  34 (1991).

22
   [6] Indeed, the only entities WLAD explicitly excludes as a public accommodation are
23  entities that are by their nature,  "distinctly private," including certain fraternal
   organizations, private clubs, or institutes, educational facilities, and a columbarium,
24  crematory, mausoleum, or cemetery operated or maintained by a religious or sectarian
   institution.  RCW § 49.60.040(2).  Even as to "distinctly private" entities, however, the
25  WLAD makes clear that such entities are covered by the law when engaging in activities
   "where public use is permitted." *Id.*

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 10

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

entertainment, sports, or recreation of any kind is offered with or without
charge . . . or where the public gathers, congregates, or assembles for amusement,
recreation, or public purposes . . . .

RCW § 49.60.040(2).  To be a public accommodation, an entity must meet only one of the
statutory criteria.  Yet, as explained more fully below, NAGAAA qualifies as a "public
accommodation" under at least six categories of the WLAD, including as an entity that (1)
charges for admission to or use of property or facilities, (2) accommodates those seeking
recreation, (3) sells goods and merchandise, (4) operates where food or beverages of any
kind are sold for consumption on the premises, (5) offers sports and recreation activities,
and (6) operates where the public gathers for amusement or recreation.

In determining whether an organization qualifies as a "public accommodation"
under the WLAD, a court must  liberally construe that term and grant only narrow
exceptions.  *Allen v. Educ. Cmty. Credit Union*, No. CO6-16MJP, 2006 WL 1495775, at
*6 (W.D. Wash. May 24, 2006) *recon. den.* (citing *Tenino Aerie*, 148 Wash. 2d at 247);
RCW § 49.60.020.  Because the WLAD substantially parallels provisions of Title VII,
courts may look to federal law in construing it.  *Russell v. Dep't of Human Rights*, 70
Wn.App. 408, 854 P.2d 1087 (1993), amended on denial of reconsideration, *rev. den.*, 123
Wash. 2d 1011, 869 P.2d 1085.  Courts may also look at other jurisdictions for instructive
guidance.  *Allen*, 2006 WL 1495775, at *6.

Like other jurisdictions, the Washington Supreme Court has established that an
entity need not be a static "place" to fall within the definition of a public accommodation.
*See, e.g., Tenino Aerie*, 148 Wn.2d at 250, 59 P.3d at 668 (noting that "the meaning of
'place of public accommodation' has expanded from fixed locations").  The court has
already established, for instance, that "WLAD reaches the membership policies of
organizations."  *Id*. at 250 n.111 (citations omitted).

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 11

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

NAGAAA, like the organizations in the cases cited above, meets not just one, but at least six definitions of a "public accommodation" under the WLAD, including as an entity that charges admission, that accommodates those seeking recreation, that sells goods and merchandise, that operates where food or beverages of any kind are sold for consumption on the premises, that offers sports and recreation activities, and that operates where the public gathers for amusement or recreation.  It is undisputed that NAGAAA charged teams a fee for admission or participation in the GSWS, including use of rented fields.  PSF ¶ 15.  NAGAAA also "accommodated those seeking recreation" by renting, operating, and controlling municipal softball facilities for the 2008 GSWS and then opening those facilities to players and other members of the public.  PSF ¶ ¶ 15, 22, 24, 31, 33.  NAGAAA contracted with ASANA and NWQuest to jointly produce the 2008 GSWS and actively encouraged the general public to attend the games and events, including Opening Ceremonies at the Seattle Center, Closing Ceremonies at the public softball fields, all of the softball games, and even a Talent Show at Hilton Seattle Airport and Conference Center.  PSF ¶ ¶ 22, 24.  NAGAAA also contracted with vendors for the specific purpose of selling "goods and merchandise" related to the 2008 GSWS (PSF ¶ ¶ 32, 33); operated at fields and facilities that sold alcohol/beverages and food for public consumption (PSF ¶ 31) and generally offered a place "where the public gathers, congregates, or assembles for amusement, recreation, or public purposes.. . . ." *See generally* RCW § 49.60.040(2).

Moreover, NAGAAA operates exactly like "Little League Baseball" did in *National Organization for Women, Essex County Chapter v. Little League Baseball, Inc.*, 127 N.J. Super. 522, 318 A.2d 33 (N.J. Super. Ct. App. Div. 1974).  In that case, which interpreted the New Jersey Law Against Discrimination, the New Jersey appellate court held that Little League was a place of public accommodation because "the invitation [to

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 12

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  play] is open to children in the community at large, with no restriction (other than sex)

2  whatever." *Id.* at 530-531.  The Court went on to conclude that "the statutory

3  'accommodations, advantages, facilities and privileges' at the place of accommodation

4  [citation omitted] is the entire agglomeration of the arrangements which Little League and

5  its local chartered leagues make and the facilities they provide for the playing of baseball

6  by children." *Id.* at 531.  There is no meaningful distinction between Little League and

7  the NAGAAA.  Like Little League, NAGAAA is open to adults in the community at

8  large, with no restriction other than its discriminatory cap based on sexual orientation.  It

9  also partners with local leagues and groups in order to foster adult softball tournaments,

10  for which it charges a significant tournament admission fee to players or teams.

11  **C.  NAGAAA Is Not A "Distinctly Private" Organization Exempted from the**
12  **WLAD**

13  Plaintiffs anticipate that NAGAAA will attempt to claim an exemption from the

14  WLAD by asserting that it is a "distinctly private" organization pursuant to RCW §

15  49.60.040(2).[7]  If NAGAAA makes such an argument, it has the burden of proof to show

---

[7] Based on deposition testimony, Plaintiffs also anticipate that NAGAAA may claim that an injury-related indemnification form signed by Plaintiffs waives their right to seek relief under RCW § 49.60.010 *et seq*.  Any such argument is misplaced.  A person cannot contract away civil rights guaranteed under the WLAD.  NAGAAA also may contend that it is not a public accommodation because an intake investigator for the Washington State Human Rights Commission ("HRC") opined before even processing a complaint questionnaire filed by Plaintiffs that NAGAAA did not constitute a public accommodation under RCW 49.60, and she thus believed that the Human Rights Commission did not have jurisdiction over the potential complaint.  Any such argument would be misplaced.  First, the investigator did not seek any factual information necessary to determine whether NAGAAA constituted a "public accommodation" under RCW 49.60.  Second, even an actual finding by the HRC is not dispositive in litigation under the WLAD - and here, no findings of any kind were made. Finally, the HRC intake clerk's position was inconsistent the Supreme Court's binding and authoritative interpretation of the WLAD in *Tenino Aerie*.  Notably, the HRC submitted an amicus brief in support of the Plaintiffs' position in *Tenino Aerie*.

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 13

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

it is a "distinctly private" entity under the law.  *See, e.g., Tenino Aerie,* 148 Wn.2d at 232-33 (affirming trial court decision requiring organizations to "prove they were 'distinctly private' in nature"); *E.E.O.C. v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458, 460 (9th Cir. 1993) (party seeking exception to statute bears the burden of proving exception applies).

NAGAAA cannot carry that burden.  The Washington Supreme Court has held that in determining whether an organization comes within the narrow exception for "distinctly private" organizations, courts should look to the factors articulated by *Roberts v. United States Jaycees*, 468 U.S. 609, and adopted by *Tenino Aerie*.  Those factors are an organization's (1) size, (2) purpose, (3) policies, (4) selectivity, (5) public services offered, (6) practices . . . , and (7) other characteristics pertinent to a particular case."  Applying those factors, the Supreme Court held that Eagles clubs were not "distinctly private" and therefore could not refuse to admit women as members.  Under the *Tenino Aerie* analysis, NAGAAA plainly is not a "distinctly private" club or organization.

First, NAGAAA's self-described large size weighs against application of the exemption.  In 2008, NAGAAA publicly claimed to have more than 10,000 players on hundreds of teams in its member leagues throughout the United States and Canada, and it contends the GSWS is the largest annual amateur LGBT athletic event in the country.  PSF ¶ ¶ 15, 12.  The size of NAGAAA therefore dwarfs even the local chapters of Jaycees which were "large and basically unselective groups" of 400 or 430 members.  *Roberts*, 468 U.S. at 621.

Second, NAGAAA's stated purposes are to:  "be a non-profit organization dedicated to the promotion of amateur sports competition, particularly softball, for all persons regardless of . . . sexual orientation or preference, with special emphasis on the participation of members of the Gay Community;" " . . . organize and conduct a gay

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   Softball World Series . . . and to otherwise foster national and international sports

2   competition;" "encourage the education and proper skills of athletics . . .;" and to "plan,

3   promote and carry out other exempt activities that serve the welfare of the public at large."

4   PSF ¶ 11.   Similar to the Rotary Club of Duarte, NAGAAA therefore "lacks the

5   selectiveness necessary to claim . . . protection based upon a private, intimate

6   relationship." *Rotary Club of Duarte*, 481 U.S. at 546.   NAGAAA also seeks "to produce

7   an inclusive, not exclusive, membership" similar to Rotary Club, *see id.* at 546-547, by

8   serving "all persons" and by "otherwise foster[ing] national and international sports

9   competition."

10          Third, NAGAAA's policies do not indicate that it is "distinctly private."

11  NAGAAA's member leagues are not required to restrict participation in regular season

12  play on the basis of sexual orientation (PSF ¶ 17) and, in any event, even NAGAAA

13  purports not to discriminate on this basis (PSF ¶ 11).   The representatives of those leagues

14  vote on delegates to NAGAAA and there is no restriction on delegate status based on

15  sexual orientation.   PSF ¶ 16.   Indeed, even with respect to team participation in the

16  GSWS, NAGAAA already allows up to two "heterosexual" players on a roster.   *See*

17  *Tenino Aerie*, 148 Wn.2d at 259 (Johnson, J., concurring) (noting that Eagles club "invites

18  women to become Auxiliary members with use of the Eagles' facilities").

19          Fourth, NAGAAA is not "selective" in any meaningful sense.   NAGAAA actively

20  recruits new players on its website.   PSF ¶ 14.   Any player who plays in a sufficient

21  number of regular season games in his or her home league can play in the GSWS,

22  provided that the necessary fees are paid.   *Id.*   Even the criteria for admission of new

23  member leagues are not particularly stringent; they need only be able to field a sufficient

24  number of teams, attend a summer meeting of NAGAAA as an observer, and then be

25  voted on by the NAGAAA Council.   PSF ¶ 13.   *Compare Tenino Aerie*, 148 Wn.2d at 253-

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 15

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

54 (Eagles clubs were not "distinctly private" even though membership required

sponsorship by two existing members, nonaffiliation with the Communist Party,

profession of belief in a Supreme Being, an interview and recommendation by an

interviewing committee, and a majority vote of members).

Fifth, NAGAAA's services do not support its claim that it is "distinctly private."

NAGAAA's principal activity is organizing a public event, the GSWS, for which

tournament admission fees are charged to teams, as well as a public Talent Show, for

which admission is charged and the proceeds donated to charitable organizations. PSF ¶¶

12, 15, 23. *Compare Tenino Aerie*, 148 Wash. 2d at 253 (noting that "Eagles support and

undertake benevolent social causes and projects, and asks for membership participation in

these service projects to better serve others and make their communities and countries

better").

Sixth, NAGAAA's other business practices demonstrate that it is not "distinctly

private." NAGAAA associated and contracted with other organizations to host the 2008

GSWS, and actively sought sponsors and partners. The 2008 GSWS accepted assistance

from tourism organizations, and used a $10,000 grant from the City of Federal Way to

help fund the tournament. NAGAAA also allowed other commercial and social entities to

display their logos and otherwise advertise, distribute products and seek membership

during the GSWS, and allowed advertising by third parties in its Players' Program and

other GSWS events. PSF ¶¶ 23-34.

In sum, the undisputed facts prove that NAGAAA is not the type of small,

selective private club that falls within this narrowly-construed exception to the WLAD.

*See Tenino Aerie*, 148 Wash. 2d at 255 (trial court properly granted summary judgment

that "distinctly private" exception did not apply).

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

In addition, even if NAGAAA were "distinctly private," NAGAAA's GSWS would still be subject to the WLAD.  In *Tenino Aerie,* the Washington Supreme Court accepted the Court of Appeals' conclusion that the WLAD applied to a "private" organization when it acted like a public accommodation (*e.g.*, holding public dances or renting facilities for events).  *Tenino Aerie*, 148 Wn.2d at 253 n.123; *see also,* RCW § 49.60.040(2) (noting that even for a "distinctly private" organization, "where public use is permitted that use shall be covered by this chapter").  Here, NAGAAA invites the public to participate in the GSWS as players and teams, it leases public softball facilities, it contracts with public vendors who sell merchandise, food and alcohol, and it invites the general public to be spectators at all GSWS events.  As such, NAGAAA's GSWS event is a "public use" event subject to the nondiscrimination provisions of the WLAD.

### D.  NAGAAA Unlawfully Discriminated Against Plaintiffs Based On Their Sexual Orientation, And Aided And Abetted Others In Doing So

#### 1.  NAGAAA's Rule 7.05 violates RCW 49.60 because it facially mandates discrimination based on sexual orientation

NAGAAA's discrimination in this case is blatant, overt, and intentional.  Rule 7.05 stated:

> Heterosexual players – a maximum of two heterosexual players are permitted on a GSWS roster.
> A team in violation of the heterosexual player guidelines shall be subject to disciplinary action that may include but is not limited to:
> 1)  permanent suspension of the heterosexual player from future GSWS and open division events.
> 2)  disqualification and forfeiture of all the offending team's games.
> 3)  one year's suspension of the team's manager.
> 4)  a minimum $100.00 fine imposed against the team's association.

By promulgating and enforcing Rule 7.05, which prohibits any team in the GSWS from having more than two heterosexual players, NAGAAA carves out a discriminatory

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

exception for players it deems "heterosexual."  In so doing, NAGAAA restricts

participation in its events based  on sexual orientation in direct violation of the WLAD.

Moreover, it is no defense in this case that NAGAAA's intention, through

Rule 7.05, is to protect gay players rather than to harm players it deems "heterosexual."

Even if NAGAAA asserts such an argument, there is nothing in the WLAD that requires

a showing of animus or a desire to harm a particular group.  *Duvall v. Cnty. of Kitsap*, 260

F.3d 1124, 1136 (9th Cir. 2001); *S. L.-M. ex rel. Liedtke v. Dieringer Sch. Dist. No. 343*,

614 F. Supp. 2d 1152, 1163 (W.D. Wash. 2008).  To the contrary it is well-settled law that

policies that explicitly exclude or favor individuals based on a protected characteristic

constitute *per* se violations of antidiscrimination statutes.  *See, e.g.*, *Int'l Union, United

Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.,* 499 U.S.

187, 197 (1991) (in Title VII case, the employer's motivation for discriminating, which

was allegedly benign, was not legally relevant; employer's policy barring all women,

except those whose infertility was medically documented, from jobs involving lead

exposure constituted sex discrimination forbidden under Title VII); *Cmty. House, Inc. v.

City of Boise,* 490 F.3d 1041, 1048 (9th Cir. 2007) (men-only policy at Community House

was facially discriminatory because it explicitly treats women and families different from

men).[8]  As the Supreme Court explained in *Johnson Controls*, "the absence of a

malevolent motive does not convert a facially discriminatory policy into a neutral policy

with a discriminatory effect."  499 U.S. at 199.  Instead, "a plaintiff makes out a *prima

facie* case of intentional discrimination . . . merely by showing that a protected group has

---

[8] *City of Boise* recognized that when analyzing a facially discriminatory policy, it is improper to probe for a discriminatory motive, or to apply the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *City of Boise*, 490 F.3d at 1049; *see also Reidt v. Cnty. of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992) ("The *McDonnell Douglas* procedure is inapt in a situation involving a facially discriminatory policy . . . .").

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  been subjected to explicitly differential—i.e. discriminatory—treatment." *City of Boise*,

2  490 F.3d at 1050 (quoting *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir.

3  1995)); *see also Mill River Club, Inc. v. N.Y. State Div. of Human Rights*, 873 N.Y.S.2d

4  167 (N.Y. App. Div. 2009) (holding that organization's "balanced membership policy" in

5  which half of the members were Christian, of mixed religious faith, or other, and the other

6  half were Jewish violated New York Human Rights Law because, despite benevolent

7  purpose of promoting diversity, the quota resulted in the denial of membership benefits

8  due to religion).

9        Like the policies and statutes deemed unlawful in *Johnson Controls*, *City of Boise*,

10 *Duvall*, and *Dieringer School District*, NAGAAA's Rule 7.05 constitutes facial

11 discrimination based on sexual orientation.  The rule creates an explicit cap of only two

12 heterosexual players on each team roster for the Gay Softball World Series, thereby

13 mandating team quotas or preferences based on sexual orientation.  Moreover, players and

14 teams face serious consequences for alleged violations of Rule 7.05, including exclusions

15 of particular players from the tournament or, as Plaintiffs faced here, full disqualification

16 from the tournament.

17       NAGAAA's Rule 7.05 and its enforcement violate the WLAD as a matter of law

18 and should be struck down by this Court.

19              **2.  NAGAAA discriminated against Plaintiffs based on their sexual
                      orientation in violation of WLAD.**
20

21       The WLAD guarantees all persons "the right to be free from discrimination . . .

22 because of sexual orientation" in the workplace, when engaging in commerce, and when

23 accessing public accommodations.  RCW § 49.60.030(1).  As to public accommodations

24 specifically, all citizens have "the right to full enjoyment of any of the accommodations,

25 advantages, facilities, or privileges of any place of public resort, accommodation,

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 19

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   assemblage, or amusement." RCW § 49.60.030(1)(a).  The WLAD explicitly mandates

2   that the law be "construed liberally" in order to effectuate its nondiscrimination goals.

3   RCW § 49.60.020.  Indeed, in enacting the WLAD, the Washington legislature made clear

4   that "discrimination against any of its inhabitants…is a matter of state concern" that

5   "threatens not only the rights and proper privileges of its inhabitants but menaces the

6   institutions and foundation of a free democratic state."  RCW  § 49.60.010.

7        The WLAD prohibits any person or the person's agent from "commit[ting] an act

8   which directly or indirectly results in any distinction, restriction, or discrimination…or the

9   refusing or withholding from any person the admission, patronage . . . [or] presence…in

10  any place of public resort, accommodation, assemblage, or amusement . . . to all persons,

11  regardless of . . . sexual orientation . . . ."  RCW § 49.60.215.

12       It is undisputed that NAGAAA treated the Plaintiffs differently from other players

13  at the Seattle World Series based on their perceived sexual orientation.  NAGAAA

14  specifically targeted Plaintiffs based on the perception that they were heterosexual or "not

15  gay," subjected them to embarrassing, public interrogation about their sexual partners and

16  practices, and then cast official, public votes determining Plaintiffs' sexual orientations in

17  order to exclude them from the GSWS.  NAGAAA then disqualified Plaintiffs' entire

18  team from the tournament, expunged them from NAGAAA's records, revoked their

19  second-place finish, and retroactively awarded their trophy to the third-place team.  In

20  other words, NAGAAA denied Plaintiffs their "right to the full enjoyment of the . . .

21  advantages, facilities, or privileges" (RCW § 49.60.030(1)(b)) of the GSWS, specifically

22  targeted Plaintiffs based on their sexual orientation in violation of the WLAD, and made

23  clear that Plaintiffs were "not welcome, accepted, or desired" participants of the GSWS.

24  RCW § 49.60.040(14).  All of these acts constitute unlawful discrimination under the

25  WLAD and this Court should grant Plaintiffs' motion for partial summary judgment.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

### 3.   NAGAAA also violated the WLAD because its policies caused other players and teams to discriminate against Plaintiffs

In addition to prohibiting direct discrimination, WLAD also prohibits any person from aiding, abetting, encouraging or inciting "the commission of any unfair practice" or from attempting to "obstruct or prevent any other person from complying with the provisions of this chapter . . . ."  RCW § 49.60.220.

Here, NAGAAA's rules encourage other players or teams to target a player based on his sexual orientation.  Section 8 of NAGAAA's Softball Code, for instance, allows any team or League Commissioner to challenge a player's perceived sexual orientation by filing a protest and paying a fee.  This rule applies only to players who are perceived to be "heterosexual," like Plaintiffs in this case, thereby subjecting them to discrimination based on their sexual orientation.  In fact, another team did challenge Plaintiffs' sexual orientation pursuant to Section 8, thereby encouraging other GSWS participants to engage in the same discriminatory behavior as NAGAAA itself.  Moreover, NAGAAA further aided this witch hunt by convening a "Protest Hearing" specifically intended to determine Plaintiffs' sexual orientations.  That hearing had nothing to do with softball, with Plaintiffs' ability to play softball, or even with tangential issues such as sportsmanship or fair play.  Rather, the public hearing focused solely on Plaintiffs' sexual orientation, including a public interrogation in a room full of strangers about Plaintiffs' sexual practices and partners.  NAGAAA thus aided and abetted other persons to discriminate against Plaintiffs based on their sexual orientation, in direct violation of the WLAD.

### VI. CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request, based on undisputed facts, that this Court rule that NAGAAA is a "public accommodation" subject to the WLAD, and that NAGAAA engaged in unlawful discrimination, and aided and

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 21

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   abetted in unlawful discrimination, against Plaintiffs based on sexual orientation.  A

2   Proposed Order is submitted with this Motion.

3          DATED this 15th day of March, 2011.

4                                                K&L GATES LLP

5
                                                 By /s/_____
6                                                   Suzanne J. Thomas, WSBA # 17338
                                                    Peter A. Talevich, WSBA # 42644
7                                                   K&L Gates LLP
                                                    925 Fourth Avenue, Suite 2900
8                                                   Seattle, Washington 98104-1158
                                                    Telephone: (206) 370-6642
9                                                   Fax: (206) 370-6315
                                                    E-mail: suzanne.thomas@klgates.com
10
                                                 NATIONAL CENTER FOR LESBIAN
11                                               RIGHTS

12
                                                 By /s/_____
13                                                  Christopher Stoll (admitted *pro hac vice*)
                                                    Melanie S. Rowen (admitted *pro hac*
14                                                  *vice*)
                                                    870 Market Street, Suite 370
15                                                  San Francisco, CA 94102
                                                    Telephone: (415) 392-6257
16                                                  E-mail: cstoll@nclrights.org
                                                    E-mail: mrowen@nclrights.org
17
                                                    Attorneys for Plaintiffs
18                                                  Steven Apilado, LaRon Charles, and Jon
                                                    Russ
19
     SE-50078 v1
20

21

22

23

24

25

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT - 22

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022