THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STEPHEN APILADO, LARON CHARLES, and JOHN RUSS,

Plaintiffs,

v.

THE NORTH AMERICAN GAY AMATEUR ATHLETIC ALLIANCE,

Defendant.

CASE NO. C10-0682

ORDER

This matter comes before the Court on Defendant's motion for partial summary judgment on Plaintiffs' request to enjoin enforcement of Rule 7.05 (Dkt. No. 33), Plaintiffs' response (Dkt. No. 36), and Defendant's reply (Dkt. No. 43). The Court also considers Plaintiffs' motion for partial summary judgment (Dkt. No. 44), Defendant's response (Dkt. No. 47), and Plaintiffs' reply. (Dkt. No. 54.) Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and rules as follows.

## I. BACKGROUND

This case arises from the disqualification of a softball team from the 2008 Gay Softball World Series (GSWS). The event was operated by Defendant North American Gay Amateur

Athletic Alliance (NAGAAA) and attended by Plaintiffs Steven Apilado, LaRon Charles, and Jon Russ. The Plaintiffs' team, D2, advanced to the final round and was playing in the championship game when the commissioner of the Atlanta league filed a protest under Rule 7.05 of the NAGAAA Softball Code against six players of the D2 team.

Rule 7.05 states that "[a] maximum of two Heterosexual players are permitted on a GSWS roster." (Dkt. No. 34 Ex. 2.) Penalties for violation of this rule include permanent suspension of the heterosexual player, disqualification and forfeiture of the offending team's games, one year's suspension of the team's manager, and a minimum $100 fine imposed against the team's association. (*Id.*) Under Softball Code Section 1.15, Gay means "having a predominant sexual interest in a member or members of the same sex and includes both gay men and lesbians." Softball Code Section 1.18 defines heterosexual as "having a predominant sexual interest in a member or members of the opposite sex." (*Id.*)

The Softball Code also establishes a mechanism for enforcing rule 7.05: the protest hearing. Rule 8.04 states that a protest can be filed by the manager of the opposing team, an open division director, or an association's commissioner. Rule 8.06 establishes the procedure for these hearings: a protest committee convenes, the protest committee chairperson begins the proceedings by explaining the procedures, the protesting party explains the basis for the protest and presents any available evidence, the protested party has an opportunity to rebut the argument, the protest committee may interview players, and the protest committee conducts a vote by secret ballot to determine the outcome. (*Id.* at (d)–(i).)

D2 lost the championship game. When it was over, NAGAAA's protest committee conducted a hearing. Upon conclusion of the hearing, the protest committee determined that Plaintiffs were "non-gay," and, therefore, that D2 was not eligible to compete in GSWS. The

protest committee disqualified D2 from the tournament, declared its victories and second-place finish in the tournament forfeited, and recommended that Plaintiffs be suspended from NAGAAA softball play for one year. (Dkt. No. 1 at 12–13).)

Plaintiffs ask the Court to rule that NAGAAA is a "public accommodation" under Washington's Law Against Discrimination (WLAD), Wash. Rev. Code § 49.60 *et seq.*, and that NAGAAA unlawfully discriminated against Plaintiffs based on their actual or perceived sexual orientation. The Court finds that NAGAAA is a public accommodation, but that the First Amendment protects their right to exclude those whose membership would negatively impact their expressive activity.

Plaintiffs seek preliminary and permanent injunctive relief against NAGAAA's enforcement of Softball Code, Rule 7.05. (Dkt. No. 1 at 28.) In order to satisfy the requirements for injunctive relief, Plaintiffs must demonstrate that there is a real and immediate harm of repeated injury. Because Plaintiffs have not shown a likelihood of repeated emotional distress, their claim for preliminary injunctive relief is denied.

Finally, it bears acknowledging that while Plaintiffs have framed this case as a matter of bisexual rights, this Order does not mention bisexuality in any sense. There is a reason for this. The first part of this Order holds that Defendant has a constitutional right to exclude anybody who does not share in its values. Whether the excluded individuals are straight or bisexual does not matter from a constitutional perspective. The second part of the Order holds that Plaintiffs did not show a real and immediate threat of repeated harm because their injury resulted from the manner in which the written policy was applied, not from the language of the policy itself. It did not appear to the Court that Plaintiffs were arguing that they were injured simply because NAGAAA adopted particular definitions of gay and straight, but rather because NAGAAA

inquired into Plaintiffs' sexual orientation in a way that was intrusive and disrespectful. Accordingly, the Court's analysis is confined to the allegedly intrusive questioning, not the definitions of gay and straight.

Plaintiffs' allegations about Defendant's treatment of bisexuality remain of central importance to this case. And Defendant could still be liable for its actions. In a recent case, the Supreme Court looked to the activities of the Westboro Baptist Church, a virulently anti-gay group who display hateful signs at soldiers' funerals. *Snyder v. Phelps*, 131 S. Ct. 1207 (U.S. 2011). The Court concluded that the First amendment does not protect all speech from claims of intentional infliction of emotional distress or invasion of privacy. *Id.* at 1215–16. Whether or not Defendant's treatment of Plaintiffs at the protest hearing is deserving of First Amendment protection remains to be seen.

## II. APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) mandates that a motion for summary judgment be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There exists a genuine issue as to a particular fact—and hence that fact "can be resolved only by a finder of fact" at trial—when "[it] may reasonably be resolved in favor of either party"; conversely, there exists no genuine issue when reasonable minds could not differ as to the import of the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986). Whether a particular fact is material, in turn, is determined by the substantive law of the case: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Summary judgment,

then, demands an inquiry into "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"; if applying the relevant law to those facts about which no two reasonable factfinders could disagree dictates that the moving party must prevail, then a motion for summary judgment must be granted. *Id.* at 250–52.

## III. DISCUSSION

### A. Plaintiffs' Motion for Partial Summary Judgment

#### *1. Washington Law Against Discrimination*

The WLAD declares that the right to be free from discrimination on the basis of race, creed, color, national origin, sex, honorably discharged veteran or military status, sexual orientation, or disability in public accommodations is a civil right. RCW 49.60.030(1). This right includes the right to "the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." *Id.* Any person injured in violation of this law can bring a private civil action to enjoin further violations or recover damages. *Id.* at (2). *Tenino Aerie v. Grand Aerie*, 59 P.3d 655, 661–662 (Wash. 2002).

Under the Law, Public Accommodation is defined as:

> any place, licensed or unlicensed, kept for gain, hire, or reward, or where charges are made for admission, service, occupancy, or use of any property or facilities, whether conducted for the entertainment, housing, or lodging of transient guests, or for the benefit, use, or accommodation of those seeking health, recreation, or rest, or for the burial or other disposition of human remains, or for the sale of goods, merchandise, services, or personal property, or for the rendering of personal services, or for public conveyance or transportation on land, water, or in the air, including the stations and terminals thereof and the garaging of vehicles, or where food or beverages of any kind are sold for consumption on the premises, or where public amusement, entertainment, sports, or recreation of any kind is offered with or without charge, or where medical service or care is made available, or where the public gathers, congregates, or assembles for amusement, recreation, or public purposes, or public halls, public elevators, and public washrooms of buildings and structures occupied by two or more tenants . . . .

RCW 49.60.040(2). The definition includes an important exception, which states:

> PROVIDED That nothing contained in this definition shall be construed to include or apply to any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations . . . .

Plaintiffs' claim in this case is based on the idea that NAGAAA is a place of public accommodation, and that it is not distinctly private. They now argue that they have presented so much evidence to support this characterization that there is no genuine issue of material fact left for trial. NAGAAA responds that there are many outstanding factual questions about the nature of their organization and the GSWS, and that the Court cannot make an accurate decision on the law without resolving these factual questions at trial.

**a.** Is NAGAA a "Place?"

Because the WLAD applies to *places* of public accommodation, the first issue the Court must decide is whether or not NAGAA is a place. While it may seem counterintuitive to call an organization a place, courts in Washington and around the country have expanded the scope of anti-discrimination laws to cover wider areas of public life. In *Tenino Aerie v. Grand Aerie*, the Supreme Court of Washington noted with approval the fact that Minnesota had expanded the definition of "place of public accommodation" from fixed locations to mobile sites to business facilities of any kind whose goods and privileges are made available to the public. 59 P.3d 655, 668–669 (Wash. 2002). The Court in *Tenino Aerie* concluded that "[l]ike other states' public accommodation laws, the WLAD reaches the membership policies of organizations." *Id.* at 668. Accordingly, NAGAAA qualifies as a "place" under Washington's anti-discrimination law.

b. Is NAGAAA Public or Private?

The next question before the Court is whether or not NAGAAA is a "public accommodation" or a "distinctly private" club. The statutory definition of a "public accommodation" is listed above. With the extraneous language stripped away, the factors for the

Court to consider are whether or not NAGAAA (1) charges for admission, (2) accommodates those seeking recreation, (3) sells goods and merchandise, (4) operates where food or beverages of any kind are sold for consumption on the premises, (5) offers sports and recreation activities, and (6) operates where the public gathers for amusement or recreation. *See* RCW 49.60.040(2).

There is little room for doubt that NAGAAA qualifies as a public accommodation. Plaintiffs argue that even though satisfaction of one of the criteria above is enough to meet the definition of a public accommodation, NAGAAA meets all six. Plaintiffs submit evidence to show that NAGAAA charges for admission (Softball Code Section 6.02), accommodates people seeking recreation (Dkt. No. 22 at ¶¶ 14 & 20), contracts with vendors who sell goods (Dkt. No. 45-2 at Ex. 10 69:2–17), operate where food and beverages are sold (*Id.* at 69:18–21), offers sports, and operates where the public gathers. (Dkt. No. 45-2 at Ex. 8 77:2–5.)

NAGAAA does not dispute that it offers sports and operates where the public gathers for amusement. It does argue that while food, alcohol, and merchandise were sold and teams were charged admission to play, NAGAAA did not profit from these sales. These are quibbles; the statute does not require profit from food, alcohol, or merchandise. Regardless, NAGAAA does not dispute that at least one criterion is met. Undaunted, NAGAAA argues that the definition does not apply to them for other reasons.

First, it points to an email from an intake investigator with the Washington State Human Rights Commission. In the email, the investigator states that the commission has decided not to pursue Plaintiff Charles's complaint because "the entity that made the decision to disqualify LaRon and his team is not a place of public accommodation. The members of the Protest Committee and the NAGAAA Commissioner, Roy Melani, are not considered a 'place' as defined by our statute. RCW 49.60.040(10)." (Dkt. No. 52 at Ex. R.) It goes without saying that

the Court is not bound by the determination of a WHRC intake investigator. And, as explained above, the Supreme Court of Washington has expanded the definition of "place" to include the membership policies of organizations. *Tenino Aerie*, 59 P.3d at 668.

Second, NAGAAA argues that the GSWS is not "open to adults in the community at large, with no restriction." But this is not part of the statutory definition of a public accommodation and therefore does not factor into the Court's decision.

Third, NAGAAA argues that "annual tournaments" are not specifically covered by the law. This is a stretch. The definition of public accommodation is a broad one and need not list every possible example to which it applies.

NAGAAA proceeds to argue that even if it satisfies the definitional elements of a public accommodation, it falls under the exception carved out of the definition due to its "distinctly private" status. For this argument, the normal burden shifts. Up until this point, the burden has been on Plaintiffs to show that NAGAAA is a public accommodation under WLAD. Because NAGAAA argues that it falls into an exception to the statute, it now carries the burden of proof on that point. *See Tenino Aerie v. Grand Aerie*, 59 P.3d 655, 659 (Wash. 2002); *See also EEOC v. Kamehameha Sch./Bishop Estate*, 990 F.2d 458, 460 (9th Cir. 1993).

The statute does not explain how to determine if NAGAAA is "distinctly private," but in *Tenino Aerie* the Supreme Court of Washington listed a number of factors for courts to consider when making a distinction of this kind. These are an organization's (1) size, (2) purpose, (3) policies, (4) selectivity, (5) public services offered, (6) practices, and (7) other characteristics. NAGAAA argues that given these factors, it is distinctly private for three reasons.

First, it argues that it has selective membership criteria: for a league to join NAGAAA, it must submit financial statements, show involvement in and dedication to the LGBT community,

meet geographical criteria, present to the NAGAAA Council why it should become a part of NAGAAA, and continue to satisfy membership criteria. (Dkt. No. 47 at 15–16.) In support of their argument that these restrictions are sufficient to meet the "distinctly private" threshold, NAGAAA cites to *EEOC v. Chicago Club*, 86 F.3d 1423 (7th Cir. 1996), a case concerning the admission practices of the Chicago Club. In that case, the court noted that the only path to membership was to be invited by a current member, a system the Court described as an "intensely personal screening procedure." *Id.* at 1437. There is nothing "intensely personal" about NAGAAA's admission standards. To the contrary, NAGAAA's mission statement celebrates inclusivity and states that its mission is to promote amateur competition "for *all persons* regardless of age, sexual orientation or preference, with special emphasis on the participation of members of the gay, lesbian, bisexual and transgender (GLBT) community." (Dkt. No. 34 at Ex. 3) (emphasis added). The burden is on NAGAAA to prove that it falls under the exception to the public accommodation, and this argument fails to meet that burden.

   NAGAAA then argues that it is distinctly private because its purpose is to emphasize participation and celebration of a specific community—the LGBT community. (Dkt. No. 47 at 16.) This is insufficient. The fact that NAGAAA caters to the LGBT community exclusively does not mean that it is a private organization. The Federation of Gay Games emphasizes the participation and celebration of the LGBT community, but does not claim to be a distinctly private organization and does not restrict heterosexual players from participating.[1] NAGAAA may be different from the Gay Games for many reasons, but emphasis on the participation of the

---

[1] FAQs on the Gay Games and LGBT Sport, http://www.gaygames.com/index.php?id=346 (last visited on May 24, 2011).

LGBT community is not one of them. This emphasis cannot be sufficient to establish NAGAAA's status as a distinctly private organization.

NAGAAA's third argument is equally off the mark. NAGAAA argues that there are disputed factual issues about its status as a business, and that these factual issues prevent summary judgment. *See Tenino Aerie*, 59 P.3d 655, 669 (Wash. 2002) (In determining what constitutes a distinctly private club, emphasis should be placed on whether the organization is a business or a commercial enterprise.). While the source of NAGAAA's funding and profitability may be in dispute, Plaintiffs have made such an extensive showing as to NAGAAA's public nature that financial questions are simply not determinative of NAGAAA's status as a distinctly private organization.

NAGAAA has failed to show that there are any genuine factual issues for trial to support their claim it is a distinctly private organization under the meaning of RCW 49.60.040. NAGAAA is a public accommodation as defined by the WLAD.

*2. First Amendment Claims*

Even if NAGAAA appears to be a public accommodation under WLAD, the Court's analysis does not end there. NAGAAA's next argument is that Rule 7.05 is protected by the First Amendment.[2] The First Amendment guarantees the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (U.S. 2000). In *Dale*, the Supreme Court observed that when laws and regulations intrude into the internal affairs of an organization, or force a group to accept

[2] Plaintiffs argue that Defendant has waived the affirmative defense that WLAD is unconstitutional because they did not assert it in their answer. (Dkt. No. 54 at 9.) The Court is wholly unconvinced that it is possible to waive one's First Amendment rights in this manner.

members it does not desire, these laws might be unconstitutional. *Id.* at 648. In essence, "[f]reedom of association . . . plainly presupposes a freedom not to associate." *Id.*

In order for NAGAAA to show that its decision to exclude someone from membership is protected by the Constitution, it must show three things: (1) NAGAAA is an expressive association, (2) forced inclusion of unwanted members would affect NAGAAA's ability to express its viewpoints, and (3) NAGAAA's interest in expressive association outweighs the state's interest in eradicating discrimination. *See id.* at 648–59.

a. Is NAGAAA an Expressive Association?

The first question the Court must address is whether or not NAGAAA is an expressive association. In *Dale*, the Supreme Court stated that in order to enjoy the First Amendment's protection of expressive association, a group "must engage in some form of expression, whether it be public or private." *Id.* at 648. In analyzing whether or not the Boy Scouts met this definition, the Court made two observations. First, the mission of the Boy Scouts is to serve others by helping to instill values in young people, such as those found in the Scout Law ("A Scout is Trustworthy Obedient Loyal Cheerful Helpful Thrifty Friendly Brave Courteous Clean Kind Reverent."). Second, scoutmasters and assistant scoutmasters use scouting activities as an opportunity inculcate these values both expressly and by example. The Court then concluded: "It seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity." *Id.* at 649. This language echoes the broad definition of expressive activity articulated by Justice O'Connor in her concurrence in the *Jaycees* case, discussed in greater detail below: "Even the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence,

patriotism, and a desire for self-improvement." *Roberts v. United States Jaycees*, 468 U.S. 609, 636 (1984) (O'CONNOR, J., concurring).

NAGAAA is well within the wide boundaries that the Supreme Court has drawn. NAGAAA's mission is to "promote[] amateur sports competition, particularly softball, for all persons regardless of age, sexual orientation or preference, with special emphasis on the participation of members of the gay, lesbian, bisexual and transgender (GLBT) community." (Dkt. No. 34 at Ex. 3.) A brochure distributed in 2008 states that NAGAAA is "committed to helping our community," "Promotes the idea of athletic competition and good physical health in support of the gay lifestyle," and "Strives for high standards of sportsmanship and conduct to attain fair play on and off the field." (Dkt. No. 52 at Ex. D.) These goals and activities are similar in many respects to the very goals and activities specifically endorsed by the Supreme Court. NAGAAA is an expressive association.

b. Would NAGAAA's Expression be Impacted if it were Prohibited from Limiting Membership?

NAGAAA argues next that admitting more than two heterosexual players per team would interfere with its chosen expressive purpose. "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 648. At this step, the Supreme Court requires a degree of judicial deference. "As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Id.* at 653. This deference is not absolute. *Dale* goes on to hold that associations like NAGAAA cannot "erect a

shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.*

In *Dale*, the Court held that the Boy Scouts of America would have difficulty expressing the viewpoint that homosexuality was inconsistent with the values embodied in the Scout Oath and Law while simultaneously allowing Dale, a gay rights activist to serve as an assistant scoutmaster. "Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.* at 654.

Here, the question is whether forcing NAGAAA to include an unlimited number of heterosexual players would significantly affect its expressive activity: promoting amateur sports by emphasizing the participation of the gay community and promoting athletic competition and physical health in support of the gay lifestyle. It would be difficult for NAGAAA to effectively emphasize a vision of the gay lifestyle rooted in athleticism, competition and sportsmanship if it were prohibited from maintaining a gay identity. *Cf. Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006) ("It would be difficult for [a student group] to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct.").

Plaintiffs argue first that NAGAAA's expressive purpose is self-contradicting. How, they ask, can NAGAAA promote amateur sports competition for *all* persons regardless of age, sexual orientation or preference and exclude people based on sexual orientation? But as the Supreme Court has stated, "it is not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent." *Dale*, 530 U.S. at 650; *see also Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 124 (1981)

("As is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational"); *see also Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714 (1981) ("Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection"). NAGAAA might very well believe that given the history of gay exclusion for sports, the only way to promote competition for *all* persons, and ensure that gay athletes have the same opportunities as straight athletes, is to create an exclusively gay community with exceptions for a small number of straight players. It is not the role of the courts to scrutinize the content of an organization's chosen expression.

Plaintiffs further argue that the controlling case is not *Dale*, but rather ***Roberts v. United** States Jaycees*, 468 U.S. 609, 627 (U.S. 1984). That case concerned the United States Jaycees, an organization whose objective was to promote and foster the growth and development of young men's civic organizations. The Jaycees brought suit against Minnesota state officials to prevent enforcement of the Minnesota Human Rights Act which might have required the Jaycees to admit women as full voting members. The Jaycees argued that they had taken a number of public positions on issues over the years, and that the inclusion of women would impact their ability to express these viewpoints. *Id.* at 626–27. The Court concluded that there was no basis in the record for concluding that admission of women as voting members would impede the organization's ability to disseminate its preferred views. While the Jaycees had a "creed of promoting the interests of young men," it could not be assumed that women would not share this creed. *Id.* at 627. The Court concluded that the Jaycees "relie[d] solely on unsupported generalizations about the relative interests and perspectives of men and women. Although such generalizations may or may not have a statistical basis in fact with respect to particular positions

adopted by the Jaycees, we have repeatedly condemned legal decision-making that relies uncritically on such assumptions." *Id.* at 628 (internal citations omitted).

By arguing that NAGAAA is similar to the Jaycees, Plaintiffs demonstrate that they misunderstand the expressive purpose of NAGAAA. NAGAAA is not claiming that heterosexuals would have different opinions about the LGBT community than that community's own members in the way that the Jaycees claimed that women would have different views on foreign policy from men. The Court would be very surprised if there is any opinion of the gay lifestyle that is not shared by at least a few straight people. Nor is NAGAAA engaged in a merely symbolic act of exclusion akin to the Jaycees. The Commissioner of NAGAAA submitted a declaration explaining that the desire for exclusivity was born of the fact that many members of the LGBT community come from backgrounds where team sports have been environments of ridicule and humiliation. (Dkt. No. 34. ¶ 2.) NAGAAA's efforts to promote an athletic, competitive, sportsmanlike gay identity, with a unique set of values, in response to a particular need, are protected by the First Amendment. Forced inclusion of straight athletes would distract from and diminish those efforts.

This does not mean, of course, that any group seeking to discriminate against an entire group of people can do by hiding behind the First Amendment. The next part of the test preserves the ability of the states to stamp out invidious discrimination wherever they find it.

    c. <u>Does the State have an Interest in Enforcing its Anti-Discrimination Laws in this Case?</u>

The final question for the Court is whether or not NAGAAA's interest in expressive association outweighs the state's interest in eradicating discrimination. A state can override freedom of associative expression "by regulations adopted to serve compelling state interests,

unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623). Plaintiffs argue that any burden on NAGAAA's expression is outweighed by the state's interest in upholding public accommodation laws. Plaintiffs cite to a case in which the Supreme Court held that requiring the Rotary Club to admit women is "justified because it serves the State's compelling interest in eliminating discrimination against women." *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987). But Plaintiffs have failed to argue that there is a compelling state interest in allowing heterosexuals to play gay softball. Plaintiffs have failed to meet their burden of showing that that there is no genuine issue of material fact with respect to the state's interest in this issue, and summary judgment is not appropriate.

**B. Defendant's Motion for Partial Summary Judgment on Injunctive Relief.**

The Court now addresses Defendant's motion for partial summary judgment on Plaintiffs' request to enjoin enforcement of Rule 7.05. There is a temptation for a court, when faced with a motion for an injunction, to exercise its considerable power and compel a party to perform some action or cease performing another. Unbridled, this temptation can beget a force more detrimental than beneficial, and intrude upon the very rights and freedoms the courts are designed to protect. It is for that reason that this Court limits its power to issue injunctions to matters where the harm is clear and the danger is imminent. *See Rizzo v. Goode*, 423 U.S. 362, 378, 46 L. Ed. 2d 561, 96 S. Ct. 598 (1976) (Injunctive relief is "to be used sparingly, and only in a clear and plain case.") This is not such a case.

To establish standing for injunctive relief, the plaintiff must show (1) that he suffered an injury in fact, (2) that the injury stems from the defendant's challenged action, and (3) that the relief sought will redress the injury. *Fortyune v. American Multi-Cinema, Inc*, 364 F.3d 1075,

1081 (9th Cir. 2004). Additionally, on a claim for injunctive relief, the party must show "a sufficient likelihood that [he] will again be wronged in a similar way[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Fortyune*, 364 F.3d 1075, 1081 (9th Cir. 2004). The likelihood of future injury is sufficient where there is a "real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *Fortyune*, 364 F.3d 1075, 1081 (2004).

Before determining whether an injunction will redress Plaintiffs' injury, or if there is a real and immediate threat of repeated injury, the Court must determine which injury or injuries are at issue. Plaintiffs list a variety of injuries in their complaint. Apilado alleges emotional distress including, but not limited to, vivid flashbacks of his interrogation, loss of sleep, humiliation, embarrassment, anger, and stress that prevented him from participating in any San Francisco Gay Softball League events for approximately a year and a half. (Dkt. No. 1 at ¶ 77.) Charles alleges emotional distress including, but not limited to, loss of sleep, loss of interest in activities he had previously enjoyed, difficulty focusing at work, increased frustration with his employees at work, and being emotionally withdrawn at home. (*Id.*) Russ alleges emotional distress including, but not limited to, loss of sleep, recurring memories of the interrogation into his sexual orientation, and related feelings of anger and helplessness, humiliation, embarrassment, and anger that affected his interactions with co-workers. (*Id.*)

Plaintiffs' list of injuries is extensive, but they nowhere show a real and immediate threat that these injuries will be repeated. There are at least two ways to demonstrate such a threat: Plaintiffs can show that the original injury stemmed from a systematic pattern of officially sanctioned conduct or directly from a written policy. *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (internal citations omitted).

*1. Plaintiffs do not Demonstrate that their Original Injury Stemmed from a Pattern of Officially Sanctioned Conduct.*

A prolonged pattern of officially sanctioned conduct that violates the plaintiff's rights may establish a sufficient likelihood of future injury. *LaDuke v. Nelson*, 560 F.Supp. 158, 160 (9th Cir. 1982), *aff'd* 762 F.2d 1318, 1324 (conduct spanned five years); *Kolender v. Lawson*, 461 U.S. 352, 355 n. 3 (1983) (credible threat where plaintiff showed fifteen instances over two years). But, a single incident is insufficient to establish a likelihood of future injury under Ninth Circuit law. *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999). In *Hodgers-Durgin*, plaintiffs alleged the United States Border Patrol had a practice of pulling over certain drivers without cause. *Hodgers-Durgin*, 199 F.3d 1037 (9th Cir. 1999). The court denied the plaintiffs' claim for injunctive relief because, in the ten years that the plaintiffs had lived in the area, Border Patrol had stopped each plaintiff just once. *Id.* at 1044.

The facts here are similar to those in *Hodgers-Durgin*. Plaintiffs allege that their original injury stemmed from an officially sanctioned pattern of conduct on the part of NAGAAA. (Dkt. No. 36 at 14.) Yet, Plaintiffs cite only one instance (i.e., the 2008 GSWS) of coming before the Committee in their history of participating in the GSWS. (Russ Decl. (Dkt. No. 40).) (Charles Decl. (Dkt. No. 41).) (Apilado Decl. (Dkt. No. 42).) In Plaintiff Russ's case, this is one instance in the six years he participated in the Series from 2002 through 2008. (Russ Decl. (Dkt. No. 40 at 2).) The 2008 GSWS incident alone does not demonstrate a pattern of officially sanctioned conduct that violates the plaintiff's rights. Thus, as in *Hodgers-Durgin*, Plaintiffs fail to establish that their injury stems from an officially sanctioned pattern of behavior.

*2. Plaintiffs do not Demonstrate that their Injury Stems from NAGAAA's Written Policy*

Where a plaintiff's original injury is directly traceable to a written policy, there is an implicit likelihood the policy may establish a sufficient likelihood of future injury. *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001). For an injury to be *directly* traceable to a written

policy, the harm must be a product of the language of the policy itself, not merely the manner in which the policy is applied. Two cases illustrate this rule.

*Fortyune v. American Multi-Cinema, Inc*, 364 F.3d 1075, 1081 (9th Cir. 2004) concerned a quadriplegic plaintiff who had attempted to see a movie with his wife. The theater was sold out and none of the members of the audience who were sitting in designated wheelchair-companion seating would give their seat to the plaintiff's wife. The theater's written policy stated that wheelchair-companion seating could be occupied by non-companions at sold-out shows. The lower court enjoined the application of the policy and the court of appeals affirmed. The plaintiff made a sufficient showing that the policy itself was discriminatory under the Americans with Disabilities Act (ADA), not merely the selective or discretionary manner in which the policy was applied.

In *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001), a group of disabled prisoners brought suit against the state of California. They claimed that the state parole board had failed to accommodate their disabilities at parole hearings and that the prisoners had been unable to represent themselves adequately at those hearings. The court found not merely that the written policy of the parole board had been applied in a way that violated the ADA but that the policy itself was in violation: it prescribed the use of forms that were inadequate for the visually impaired, for the deaf, and for the mentally disabled; it lacked any process to determine if hearing facilities were accessible for the mobility impaired; and the only accommodations offered to prisoners were offered primarily at the discretion of board employees. *Id.* at 862–63.

In the present case, however, Plaintiffs' injuries stem not from NAGAAA's written policy itself, but from the manner in which it was applied. NAGAAA's written policy (Softball Code Section 8.06(h)) merely states that the protest committee will have the authority to

interview the players involved in the dispute. (Dkt. No. 34 Ex. 2.) Plaintiffs' complaint does not allege that their injuries were the result of being interviewed *per se*. The alleged events that led to Plaintiffs' injuries—the protest committee asking personal and intrusive questions in front of approximately twenty-five delegates and observers, repeating votes until a verdict of "non-gay" was reached, and widely publicizing the verdict—cannot be directly traced to the written policy. (*Id.* at ¶¶ 35–42.) To the contrary, Plaintiffs allege in their complaint that the hearing process did not comport with NAGAAA's own rules on hearings. (Dkt. No. 1 at ¶ 34.) This is distinct from *Fortyune*, where the written policy of the theater contemplated precisely the situation in which plaintiff found himself and explicitly prescribed an outcome that violated the ADA. It is also distinct from *Armstrong* where the written policy, among other things, mandated the use of a form that was in violation of the ADA. In *Fortyune* and *Armstrong*, the injury was *directly* traceable to a written policy; Plaintiffs' injury is not.

Plaintiffs have failed to demonstrate clear harm and imminent danger. They are not entitled to injunctive relief.

## IV. CONCLUSION

For the reasons explained above, Defendant's motion for partial summary judgment is GRANTED. (Dkt. No. 33.) Plaintiff's motion for partial summary judgment is DENIED. (Dkt No. 44.)

DATED this 27th day of May 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE