THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STEVEN APILADO, LARON CHARLES, AND JON RUSS,<br><br>Plaintiffs,<br><br>v.<br><br>THE NORTH AMERICAN GAY AMATEUR ATHLETIC ALLIANCE,<br><br>Defendant. | CASE NO. C10-0682-JCC<br><br>ORDER |

This matter comes before the Court on the supplemental motion for partial summary judgment of Defendant North American Gay Amateur Athletic Alliance ("NAGAAA") (Dkt. No. 89), Plaintiffs' revised response (Dkt. No. 102), and Defendant's reply (Dkt. No. 104). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

I.   BACKGROUND

The general facts of this case are by now familiar and need not be repeated here. In a May 31, 2011 order (Dkt. No. 69), the Court denied Plaintiffs' motion for partial summary judgment as to whether Rule 7.05, which stated that teams participating in the Gay Softball World Series ("GSWS") were limited to two players who were not predominantly interested in the same sex, violated the Washington Law Against Discrimination ("WLAD"). In response to the motion, NAGAAA argued that Rule 7.05 was protected by the First Amendment.

To determine whether or not the First Amendment did indeed protect Rule 7.05, the Court applied the three-pronged test found in *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000).[1] Under that test, NAGAAA's decision to exclude someone from membership is protected by the Constitution if NAGAAA can show three things: (1) NAGAAA is an expressive association, (2) forced inclusion of unwanted members would affect NAGAAA's ability to express its viewpoints, and (3) NAGAAA's interest in expressive association outweighs the state interest in eradicating discrimination. *See id.* at 648–59. The Court held that NAGAAA had satisfied the first two prongs but determined that the parties had not provided enough information to resolve the third prong. (Dkt. No. 69 at 11–16.)

Later, in response to a motion for reconsideration from the Plaintiffs, the Court requested additional briefing from the parties on that third prong, so that NAGAAA's First Amendment rights under the *Dale* test could be conclusively decided. (Dkt. No. 87) The Court now considers that final question: does NAGAAA's interest in expressive association outweigh the state interest in eradicating discrimination?

## II. DISCUSSION

### A. NAGAAA's Interest in Expressive Association

In the previous Order, wherein the Court determined that NAGAAA was an expressive association, the Court did not find an explicit formulation of the message NAGAAA intended to express. Instead, the Court found that NAGAAA communicated a mission and a purpose through its literature that fell easily within the standards that the Supreme Court had set for an expressive association. (Dkt. No. 69 at 12.) Now, however, NAGAA has made its intended message explicit:

> NAGAAA has chosen to send a message through the annual Gay Softball World Series that athletes can play competitive team sports 'as **openly** gay, lesbian, and bisexual individuals,' and to 'demonstrate that there are such men and women.'

---

[1] Plaintiffs now argue that the *Dale* case is distinguishable. Even if the facts of the case are different, Plaintiffs have not shown why the standard should not be applied.

(Dkt. No. 89 at 1) (emphasis in original) (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 561 (1995). The importance of this statement of NAGAAA's expressive purpose is that it provides a basis for excluding not only straight players, but also "closeted" players who choose not to publicly identify as LGBT.

Plaintiffs argue that the insistence on openly LGBT members is a retroactive pretext for discrimination against players who chose not to identify as such. (Dkt. No. 102 at 5.) The Court disagrees. While the precise nature of sexual identity is a subject on which this Court declines to opine, it is safe to say that sexual orientation, unlike race or sex, is generally identifiable by private conduct or public expression. To determine a prospective member's sexual orientation, NAGAAA could look at their private conduct or their public expression. Given that it was NAGAAA's alleged examination of Plaintiffs' private conduct that led to claims for invasion of privacy in this case, it is reasonable that an organization seeking to limit participation to gay athletes would require members to express whether or not they are gay athletes. Therefore, the Court accepts NAGAAA's statement of its expressive purpose as presented.

To weigh NAGAAA's interest in expressive association, the Court must examine evidence of the impact that admitting players who do not meet NAGAAA's eligibility requirements would have on that expression. *See Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (U.S. 1987) ("In this case, however, the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes.") As discussed above, the Court has already held that NAGAAA's protected First Amendment rights would be burdened by forcing them to include an unlimited number of athletes who do not meet their membership rules. (Dkt. No. 69 at 11–15.)

> The Commissioner of NAGAAA submitted a declaration explaining that the desire for exclusivity was born of the fact that many members of the LGBT community come from backgrounds where team sports have been environments of ridicule and humiliation. (Dkt. No. 34. ¶ 2.) NAGAAA's efforts to promote an athletic, competitive, sportsmanlike gay identity, with a unique set of values, in

response to a particular need, are protected by the First Amendment. Forced inclusion of straight athletes would distract from and diminish those efforts.

(*Id.* at 15.)

There is additional evidence to support this conclusion. Chris Balton, the Assistant Commissioner of the Memphis league, testified that inclusion of straight players in that league resulted in the loss of a sense of community. (Dkt. No. 89 at Ex. 3 16:17–17:9.) Geoff da Silva, the Treasurer of NAGAAA in 2008 and the former commissioner of the NAGAAA member league for Toronto, testified that Rule 7.05 was implemented in response to problems that NAGAAA had in its formative years. (Dkt. No. 89 at Ex. 1 ¶¶ 4.) At that time, participation was open to all and predominately straight teams were playing in and winning the GSWS. (*Id.*) Da Silva testified that "this was because some local bars at the time were building teams purely to win, for self-promotion, and they did not care about the spirit of NAGAAA or the Gay Softball World Series." (*Id.*) Gary Carter, the Business Development Director for NAGAAA, testified that NAGAAA "allows members of the LGBT community to see that they can be out and open, and play sports." (*Id.* at Ex. 10 ¶ 3.) Unlike *Duarte*, therefore, the evidence in this case demonstrates that admitting straight and closeted players would affect in a significant way the existing members' ability to carry out their various purposes.

### B.     Washington State's Interest in Eradicating Discrimination

The next step for the Court is to examine the state interest in enforcing its public-accommodation laws. One disagreement between the parties is over the appropriate scope of relevant state interest: NAGAAA argues that the state has no particular interest in preventing discrimination against straight and closeted softball players, while Plaintiffs argue that the state is interested in eliminating all forms of discrimination, regardless of the particulars. (Dkt. No. 89 at 7; 102 at 2.) Plaintiffs cite to federal and Washington law to support their chosen level of generality. In *Roberts v. United States Jaycees*, a case involving the admission of women to a men's club, the Supreme Court referred to a state's interests in "eliminating discrimination and

ORDER
PAGE - 4

assuring its citizens equal access to publicly available goods and services." 468 U.S. 609, 624 (1984). The Supreme Court of Washington used similar language, holding that "the purpose of the WLAD—to deter and eradicate discrimination in Washington—is a policy of the highest order." *Tenino Aerie v. Grand Aerie*, 59 P.3d 655, 666–667 (Wash. 2002).

Notwithstanding the courts' occasional use of general language, these cases do not have the force that Plaintiffs hope. In both *Duarte* and *Roberts*, the Court focused on the specific type of discrimination at issue. In *Roberts*, the Court held "We are persuaded that Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (U.S. 1984). Likewise, in *Duarte*, the Court held "Even if the [anti-discrimination act] does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the state's compelling interest in eliminating discrimination against women." *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (U.S. 1987). Indeed, *Dale* summarized these cases as holding that "States have a compelling interest in eliminating discrimination against women in public accommodations." 530 U.S. at 657.

*Roberts*, *Duarte*, and *Dale* all support the thrust of NAGAAA's argument: the state interests should be narrowly defined to a particular form of discrimination. Indeed, if state public-accommodation statutes truly prohibited discrimination against all groups and in any form, then freedom of association would be toothless. Plaintiffs have not shown, and the Court cannot find, any reason to believe that the state interest in eliminating NAGAAA's exclusionary policies outweighs NAGAAA's associational rights. Accordingly, the First Amendment protects NAGAAA's membership policy from Washington's public-accommodation laws.

**C.     Plaintiffs' Race Claim**

Plaintiffs argue in their response that Rule 7.05 has a disproportionate impact on men of color, who are less likely to adopt the label "gay." (Dkt. No. 102 at 2–3.) In its reply, NAGAAA

moves to strike the testimony of Professor Robinson, Plaintiffs' expert on this subject, and moves (albeit obliquely) to dismiss any race-based discrimination claim. (Dkt. No. 104 at 5.) Although a motion to dismiss at this stage would be improper, the Court considers Plaintiffs' racial discrimination claims within the context of Plaintiffs' sexual-orientation discrimination claims. Plaintiffs do not argue that Rule 7.05 discriminates against men of color, but rather men of color who are closeted or choose not to identify as predominantly gay. The Court has found that the First Amendment protects NAGAAA's ability to exclude people who choose not to identify as predominantly interested in the same sex. Accordingly, Plaintiffs do not have an independent claim for racial discrimination under the WLAD. However, Plaintiffs' may use Professor Robinson's testimony as part of their claims arising from conduct at the 2008 protest hearing.

## III. CONCLUSION

For the foregoing reasons, the Court finds that NAGAAA's motion for partial summary judgment on Plaintiffs' WLAD claims is GRANTED. (Dkt. No. 89.) NAGAAA's motion to strike (Dkt. No. 104) is DENIED. NAGAAA's request for referral to a settlement judge is DENIED. (Dkt. No. 110.)

DATED this 10th day of November 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE